# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| In Re: ) | |
| ) | **JUDGE RICHARD L. SPEER** |
| Ronald and Leslie Cantelli ) | |
| ) | Case No. 12-30748 |
| Debtor(s) ) | |
| ) | |
| ) | |

## DECISION AND ORDER

This cause comes before the Court after an Evidentiary Hearing on the Motion of the United States Trustee to Dismiss. (Doc. No. 48). As the basis for its Motion to Dismiss, the United States Trustee cited to § 707(a) and § 707(b) of the Bankruptcy Code. At the commencement of the Hearing, however, the United States Trustee withdrew its action to have this case dismissed under § 707(b). As such, the Hearing held on the Motion of the United States Trustee to Dismiss was limited to the applicability of § 707(a) – providing for the dismissal of a debtor's Chapter 7 bankruptcy case when "cause" is shown. The Debtors have objected to the dismissal of their case under § 707(a). (Doc. No. 36).

At the conclusion of the Hearing held in this matter, the Court deferred ruling on the merits of the Motion of the United States Trustee to Dismiss so as to afford the opportunity to fully consider the evidence and arguments presented by the Parties. The Court has now had this opportunity and, for the reasons set forth herein, finds that the Motion of the United States Trustee has merit. Accordingly, unless the Debtors timely convert their bankruptcy case, this case will be dismissed.

## BACKGROUND

The Debtors in this case are Ronald and Leslie Cantelli, husband and wife (hereinafter referred to collectively as the "Debtors"). Mr. Cantelli is a professional cabinet maker, owning his

own business. During the course of operating his cabinet making business, the Debtor has employed a number of persons, presently having 12 employees in his charge. Since 2009, Mrs. Cantelli has worked full-time for her husband's cabinet making business in the capacity of an "office manager."

On February 28, 2012, the Debtors filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. (Doc. No. 1). At the time they filed for bankruptcy relief, the Debtors had two minor children, a son and a daughter.

In seeking bankruptcy relief, the Debtors disclosed two interests in real property: their residence, which they valued at $865,000.00; and a second parcel of property, which they valued at $15,000.00. Title to both these properties is held in the name of the "Leslie Cantelli Revocable Living Trust."

The Debtors' residence is a four-bedroom, three-and-one-half-bath home with 5,176 square feet of living space. The Debtors constructed the property in 2002, at a cost of approximately $450,000.00. Because of Mr. Cantelli's professional expertise and contacts, the Debtors were able to construct their home at a below market rate. The Debtors financed the construction of their home by initially taking a home-mortgage loan in 2002 in the amount of $250,000.00.

As a part of their bankruptcy filing, the Debtors disclosed an interest in a variety of personal assets, including three automobiles: a 2002 Ford F-150, a 1998 Jaguar XK8, and a 1999 Land Rover Discovery II. According to the information provided by the Debtors, the value of each individual vehicle, none of which are encumbered by any lien or other interest, does not exceed $3,200.00. It was also brought to the Court's attention that Mrs. Cantelli has in her possession and regularly uses a vehicle which is owned by her mother, but for which Mrs. Cantelli reimburses her mother the sum of $288.77 per month to service the debt secured against the vehicle.

In all, the Debtors disclosed in their bankruptcy filing assets worth $1,201,790.67 against liabilities totaling $1,569,675.44. After their residence, the Debtors' most significant asset in terms

**In re Ronald and Leslie Cantelli**
Case No. 12-30748

of value was listed as "Funds due from business for loans to company," with an assigned worth of $300,000.00. No actual documentation evidencing this asset, however, was provided.

The Debtors' liabilities were listed in these terms: (1) $1,137,019.77 in secured claims; (2) $275,521.72 in unsecured, priority claims; and (3) $157,133.95 in unsecured, nonpriority claims. The bulk of the Debtors' secured obligations may be divided into two components: mortgages and tax liens. The mortgage obligations total $783,974.00, consisting of a first mortgage in the amount of $675,544.00 and a second mortgage in the amount of $108,430.00. Both of these mortgages encumber the Debtors' residence. Also encumbering their residence, a tax lien in the amount of $270,521.72, while against their second parcel of real property, there exists another tax lien for the sum of $72,255.00.

Duplicating the sum of the tax lien against their residence, the Debtors' unsecured, priority debt was set forth in the sum of $270,521.72. As the basis for this obligation, the Debtors stated that it arose from unpaid federal withholding taxes for the years 2004 through 2008. Finally, the information submitted by the Debtors shows that their $157,133.95 in unsecured, nonpriority debt consists mostly of credit-card obligations.

As a whole, the Debtors set forth that their obligations are primarily in the nature of business debts – a point which the United States Trustee, by withdrawing that portion of its Motion to Dismiss under § 707(b), did not contest.[1] As it regards the business nature of their debts, the information presented to the Court shows that, since at least 1990, Mr. Cantelli has operated his cabinet making business. For his business operations, Mr. Cantelli has owned a controlling interest in the following business entities, some of which, as noted below, are now longer in operation:

Chattabrooke Cabinets, Inc., formed June 1990.

Business ceased operating, filing for bankruptcy protection in 1992.

---

[1] 11 U.S.C. § 707(b) applies only to debtors "whose debts are primarily consumer debts . . . ."

Page 3

> QMC Cabinet Makers, Inc., formed June 1995.
>
>> In January 4, 2007, articles of incorporation were cancelled for failure to pay the necessary franchise tax.
>
> Ohio Cabinet Makers, Inc., formed June 1995.
>
>> By 2004, business had ceased operations.
>
> KEC Holdings, LLC, formed March 2005.
>
>> Currently in operation. Functions as holding company whereby it owns equipment, which is then leased to Mr. Cantelli's cabinet making business. Between 2008 and 2011, KEC generated net rental of $202,866.00. (Doc. No. 28, at pg. 12).
>
> Northern Lights Cabinetry, LLC, formed 2006.
>
>> Currently in operation. Constitutes the business entity under which Mr. Cantelli presently operates his cabinet making business.

Under one or more of these business entities, Mr. Cantelli's cabinet making business has been in continuous operation. Although the exact mechanics were never disclosed, it was indicated to the Court that when one of the above business entities used in Mr. Cantelli's cabinet making business became defunct, its assets, but not its liabilities, would be transferred to a newly formed business for little or no consideration.

In addition to the foregoing businesses, which were limited to Mr. Cantelli's cabinet making operation, the Debtors also, on a prepetition basis, maintained interests in these concerns:

> C&C Investments, Partnership (Mr. Cantelli, 50% owner)
>
>> Owned six separate parcels of rental real estate, consisting of one apartment building, one commercial building, one condominium, and three houses.
>
>> In 2008, the real estate was sold to a third party, Feick, LLC, for the sum of $180,000.00. The purchase agreement, however, provided that C&C Investments would continue to rent the properties, with C&C

> Investments paying to Feick, LLC, a set amount based upon the purchase price. As a part of this transaction, C&C Investments maintained a three-year option to repurchase the properties for the sum of $216,000.00. This agreement was renewed in 2011 under substantially identical terms. For the years 2009 through 2011, C&C Investments reported net losses for its rental activities.
>
> In his bankruptcy petition, Mr. Cantelli listed this business as "defunct."

Hoty 250 Water, Ltd., (Mr. Cantelli, 1% owner)

> In operation from 2000 to 2009.
>
> Mr. Cantelli sold his interest in 2010, receiving a distribution of $19,986.00

Hoty MD, Ltd., (Mr. Cantelli, 1% owner)

> In operation from 2000 to 2008.
>
> Mr. Cantelli sold his interest in 2011, receiving a distribution of $11,120.00

At the time they sought bankruptcy relief, the Debtors did not disclose Mr. Cantelli's sale of his interests in the Hoty business entities. In addition, a recent loan of approximately $12,000.00 taken by the Debtors against a life insurance policy was not initially disclosed.

As exhibited by the substantial tax claims disclosed by the Debtors, Mr. Cantelli, in operating his cabinet making business, often became delinquent in his tax obligations. A large portion of the delinquent tax obligation arose from Mr. Cantelli's failure to pay to the Internal Revenue Service (hereinafter the "IRS") payroll taxes withheld from employees' wages. Based upon the nonpayment of taxes, various tax liens have been filed against the Debtors' property and those business entities controlled by Mr. Cantelli. (Doc. No. 49, UST. Ex. 19-1).

The tax deficiencies, which gave rise to the tax liens, began in the year 1990, and occurred frequently thereafter. Of note, beginning in the year 2000, the evidence before the Court shows that

In re Ronald and Leslie Cantelli
Case No. 12-30748

tax deficiencies existed with respect to Mr. Cantelli's businesses for each year thereafter, until the year 2009. Illustrative of the reoccurring tax deficiencies are the following tax liens as most recently assessed against Mr. Cantelli and his business interests:

| Party Name | Date | Amount |
| --- | --- | --- |
| Ronald Cantelli | 1/15/2010 | $270,521.72 |
| QMC Cabinet Makers, Inc. | 2/18/2011 | $374,440.77 |
| Ronald Cantelli & Northern Lights Cabinetry | 5/23/2011 | $72,255.05 |

Id.

In the years 2004 and 2007, the Debtors made significant payments toward their tax liabilities – particularly, those tax obligations arising from the nonpayment of withholding taxes. The means to make these payments were partially obtained through the Debtors taking advances on their credit cards. More significantly, however, the Debtors refinanced their home on two separate occasions, using the bulk of the available proceeds received therefrom to pay their tax obligations. First, in 2004, the Debtors conveyed a first and second mortgage on their home, receiving in return financing worth $740,000.00. Second, in 2007, the Debtors again conveyed a first and second mortgage on their home, receiving in exchange financing in the sum of $854,905.00.[2] (U.S.T. Ex. 20-1).

Despite the sizeable payments they made toward their tax obligations, the Debtors, when they filed for bankruptcy relief, were still seriously delinquent with respect to their tax obligations. In this regard, the IRS filed a proof of claim in the Debtors' case in the amount of $355,168.43, representing unpaid taxes for the reporting periods running from September 30, 2003, through September 30, 2009. (Claim No. 3-1). Moreover, as to this liability, there still exists a question as to whether the

---

[2] It is assumed that, with respect to this second refinancing, the prior mortgage obligations encumbering the Debtors' residence were retired.

Page 6

In re Ronald and Leslie Cantelli
Case No. 12-30748

proof of claim filed by the IRS constitutes a final determination of the Debtors' outstanding federal tax liabilities, with the Debtors having just filed, or preparing to soon file, their federal tax returns for the years 2008 through 2011.

As a part of their bankruptcy disclosures, the Debtors reported a net monthly income of $6,072.41, representing $2,127.29 in net monthly income for Mr. Cantelli and $3,945.12 in net monthly income for Mrs. Cantelli. This overall level of household income for the Debtors has remained relatively consistent over the years; however, it was reported that recently Mr. Cantelli's level of income has decreased, while Mrs. Cantelli's level of income has increased – a situation Mr. Cantelli acknowledged was brought about out of a concern that the IRS would seek to attach his wages.

Against their income, the Debtors reported current monthly expenditures of $10,828.54, leaving the Debtors with a shortfall in their monthly budget of $4,756.13. The Debtors' largest claimed expense, by far, is for their home which, exclusive of taxes and insurance, requires an expenditure of $7,248.87 per month to services the two mortgages.[3] In the past, income attributable to Mr. Cantelli's cabinet making business has been utilized by the Debtors to help pay for their mortgage obligations. When they filed for bankruptcy relief, the Debtors disclosed that they intended to reaffirm on the mortgage obligations encumbering their residence. The Debtors, however, while having yet to vacate their residence, have since retracted this stated intention.

In addition to their housing expenditure, the Debtors budget $405.00 per month for phone/cable/internet usage. The Debtors' budget also reflects a monthly expenditure of $800.00 for recreation and entertainment. Consistent with this expense, financial information provided to the Court shows that the Debtors have expended significant amounts of money for dance lessons and baseball related activities for their children. (U.S.T. Ex. No. 10). The Debtors have also recently taken a number of trips to places such as Arizona, Las Vegas, Florida, and Puerto Rico.

---

[3] The Debtors are currently in arrears on their mortgage obligations by a number of months.

Page 7

In re Ronald and Leslie Cantelli
Case No. 12-30748

In the past, the Debtors have also engaged in a sizeable amount of gambling activities, with the Debtors showing from 2008 to 2010 gambling winnings of $44,648.00 against losses of $39,795.00. Although not disclosed in their bankruptcy schedules, the Debtors further budget approximately $200.00 a month for a housekeeper. The Debtors' monthly budget also shows a $600.00 allotment for food, an amount which appears to be understated given that the Debtors related to the Court that they frequently dine out.

## DISCUSSION

Before this Court is the Motion of the United States Trustee to Dismiss pursuant to 11 U.S.C. § 707(a). Matters concerning the dismissal of a case, which affects both the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(J)/(O). As a core proceeding, this Court has been conferred with the jurisdictional authority to enter a final order in this matter. 28 U.S.C. § 157(b)(1).

Section 707(a) of the Bankruptcy Code provides that the "court may dismiss a case under this chapter only after notice and a hearing and *only for cause* . . ." (emphasis added). Section 707(a) then goes on to provide a list of three grounds that may constitute "cause" for dismissal. 11 U.S.C. § 707(a)(1)/(2)/(3). The three grounds for dismissal as specified in § 707(a) are: (1) unreasonable delay by the debtor that is prejudicial to creditors; (2) a debtor's failure to pay certain statutory fees; and (3) a debtor's failure to file certain required information.

The three grounds listed in § 707(a), however, are not exclusive, with it being recognized that a court may dismiss a debtor's chapter 7 case for "cause" generally. *Smith v. Geltzer (In re Smith)*, 507 F.3d 64, 72 (2nd Cir. 2007). The Motion of the United States Trustee (hereinafter the "UST") to Dismiss is based upon this precept. According to the UST, "cause" generally exists to dismiss this case because the Debtors, in seeking relief under Chapter 7 of the Bankruptcy Code, acted in "bad faith." (Doc. No. 28, at pg. 21).

Page 8

In re Ronald and Leslie Cantelli
Case No. 12-30748

In the case of *Industrial Ins. Servs., Inc. v. Zick (In re Zick)*, the Sixth Circuit Court of Appeals recognized that a "lack of good faith," although not an enumerated ground, could serve as a valid basis to dismiss a case for "cause" under § 707(a). 931 F.2d 1124, 1126-27 (6th Cir.1991). In making this assessment, the Court in *In re Zick* held that the "facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases." *Id.* at 1127, *citing In re Bingham*, 68 B.R. 933, 935 (Bankr. M.D.Pa.1987). However, according to the Court in *In re Zick*, certain considerations will lend themselves to a good faith analysis under § 707(a).

First, the Court in *In re Zick* found the considerations relied upon by the bankruptcy court in the case were sufficient to support the bankruptcy court's finding of bad faith. These considerations were: (1) the debtor's manipulations which reduced the creditors in the case to one; (2) the debtor's failure to make significant lifestyle adjustments or efforts to repay; (3) the fact that the petition was filed clearly in response to [a creditor] obtaining a mediation award; and (4) the unfairness of the debtor's use of Chapter 7 under the facts in this case. 931 F.2d at 1128.

Second, the Court in *In re Zick* also set forth that dismissal for a lack of good faith would be warranted in the situation before it, where the debtor "concealed or misrepresented assets and/or sources of income," and where the debtor filed for Chapter 7 relief based upon the "intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Id.* at 1129. Finally, in *In re Zick*, the Court attributed to the debtor a "bad faith motivation" in seeking Chapter 7 relief where the debtor made arrangements with certain creditors – *e.g.*, family members – to repay their debts, while seeking to discharge a debt incurred by a "malicious breach of a noncompetition agreement" in which a judgment had just been rendered. *Id.*

The above considerations taken into account by the Court in *In re Zick* lend themselves to the dismissal of this case. First, in assessing the evidence before it, the Court is not persuaded that the Debtors were entirely forthwith in their financial disclosures. This lack of openness is exemplified by a number of omissions and deficiencies contained in the Debtors' financial disclosures.

Page 9

In re Ronald and Leslie Cantelli
Case No. 12-30748

      Of initial concern for the Court is Mr. Cantelli's business interest in C&C Investments. This business enterprise, in which Mr. Cantelli is a 50% owner, centers on the lease of real property. Although his interest in this business was disclosed in his bankruptcy schedules, Mr. Cantelli set forth that the business enterprise was "defunct." This status of the business, however, was contradicted by Mr. Cantelli's own testimony at the Hearing held in this matter, at which time Mr. Cantelli acknowledged that he was still receiving rental income on behalf of the business.

      Moreover, there exist other deficiencies with respect to the Debtors' disclosures concerning C&C Investments. One, any profit or loss from the business was not accounted for in the Debtors' bankruptcy filing. Instead, the Debtors simply set forth that for the two most recent years, 2011 and 2012, their rental income was "0.00." Similarly, the Debtors ascribed a value of "0.00" to their interest in the business, a statement which does not align itself with the evidence presented to the Court.

      As disclosed to the Court, C&C Investments presently maintains an option to repurchase the six properties it sold to Feick, LLC. According to the statements made by Mr. Cantelli, this option has value, with Mr. Cantelli testifying that the properties sold by C&C Investments could now be worth approximately a half a million dollars, a value which is more than double the amount needed by C&C Investments to exercise its option to repurchase the properties. Under these circumstances, ascribing a value of "0.00" to C&C Investments can only be viewed as misleading.

      The Debtors' lack of full disclosure is also exhibited in other areas. The first concerns Mr. Cantelli's 1% interests in Hoty 250 Water, Ltd., and Hoty MD, Ltd. Although Mr. Cantelli did disclose the existence of his past interests in both of these business entities, Mr. Cantelli's divestiture of these interests, through a relatively recent sale in which he received approximately $30,000.00, was not disclosed.[4]

---

[4] As a part of their financial disclosures, debtors are required to file a "Statement of Financial Affairs." 11 U.S.C. § 521(a)(1)(B)(iii). Question 10 of this statement, entitled "Other Transfers"

Page 10

In re Ronald and Leslie Cantelli
Case No. 12-30748

In filing for bankruptcy relief, the Debtor likewise omitted a recent loan of approximately $12,000.00 taken by the Debtors against a life insurance policy. Regardless of the Debtors' contention that they did not own the life insurance policy, the receipt of these funds should have been disclosed. Other deficiencies with the initial disclosures made by the Debtors include: (1) listing the value of KEC (Mr. Cantelli's equipment holding company) as $0.00, when the company generated net rental income between 2008 and 2011 of more than $200,000.00; and (2) totally omitting any reference of their business relationship with Feicke, LLC.

It is also problematic that, in their original household budget filed with the Court, the Debtors claimed a monthly shortfall of $4,756.13, a statement which is neither presently nor historically accurate. Presently the statement is inaccurate, with the Debtors acknowledging that, because of their intention to surrender their home, they are no longer making the $7,248.87 monthly payment toward their mortgage obligations. Historically, the claimed shortfall is inaccurate, with the Debtors also revealing that, in the past, they caused funds from Mr. Cantelli's business operation to be diverted from the business to pay for their personal mortgage obligations. These circumstances should have been initially disclosed.

Regarding the above deficiencies, the Debtors contended that nothing nefarious was intended. And looked at individually, each of the above omissions, while of import, would not necessarily be a strong indication of a lack of good faith. In this matter, however, it is the scope of the above

---

asks this question:

> List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case.

As applied to this question, the exact date of the 2010 sale of Hoty 250 Water, Ltd. is not clear. Thus, the sale may have occurred outside the two-year time frame set forth in Question 10, with the Debtors filing for bankruptcy in February of 2012. In any event, the sale of Hoty MD, Ltd., occurring in 2011, falls within the two year window provided in Question 10.

Page 11

matters not disclosed by the Debtors which strongly lends itself to the conclusion that the Debtors have not been entirely forthcoming with the true nature of their financial affairs.

The Debtors' position is further belied by this deficiency: the Debtors did not later, on their own accord, seek to rectify the misinformation contained in their initial disclosures. Instead, the Debtor's only sought to explain the inaccuracy of their original disclosures when prodded by the UST. Put differently, the Debtors placed the impetus on other parties to inquire about the true nature of their financial affairs.

Considered on whole, therefore, the Debtors' approach is inapposite to a debtor's duty to provide a full and complete disclosure of their financial affairs. *Stephenson v. Malloy*, 700 F.3d 265, 267 fn. 2 (6th Cir. 2012), *citing* 11 U.S.C. § 521(a)(1). Their approach, moreover, goes contrary to the continuing duty of disclose placed upon debtors. *In re McClellan*, 428 B.R. 737, 745, fn. 1 (Bankr. N.D.Ohio 2009), *citing Lewis v. Weyerhaeuser Co.*, 141 Fed.Appx. 420, 424 (6th Cir.2005) ("the duty of disclosure is a continuing one, . . ."). *See also* FED.R.BANKR.P. 1009 (affording a liberal approach to amendments). To this end, this Court has previously remarked: "when in doubt, disclose." *United States Trustee. v. Halishak (In re Halishak)*, 337 B.R. 620, 630 (Bankr.N.D.Ohio 2005).

The Debtors' failure to be entirely forthright in their bankruptcy filing is not the only consideration which works against their favor. Similar to the situation in *In re Zick*, the Debtors' use of the bankruptcy process may be said to be aimed at one creditor: the IRS. Furthermore, the Debtors' treatment of their tax obligations can hardly be considered equitable. In fact, the Debtors' treatment of the claims held by the IRS is not only inequitable, but is consistent with the consideration raised in *In re Zick* regarding an "intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." These conclusions are supported by the prepetition treatment afforded by the Debtors to their tax obligations.

For his cabinet making business, Mr. Cantelli has, since the early 1990's, operated a number of business entities. Some of these business entities have been dissolved or are otherwise no longer in operation. All the business entities operated by Mr. Cantelli for his cabinet making business incurred liabilities for unpaid federal taxes, with a large portion of the tax liabilities arising from the nonpayment of withholding taxes. When forming a new business entity, the assets, but not the liabilities, of an operating business entity would be transferred to the new business entity.

These facts strongly suggest that, as asserted by the UST at the Hearing, the Debtors have used a successive string of business entities to avoid their legal responsibility to pay their taxes. This conclusion is only reinforced by the fact that Mr. Cantelli has continuously operated and exercised exclusive control over his cabinet making business. As a result, with Mr. Cantelli's business operation remaining in constant operation over the years, the Court can discern little need on the part of Mr. Cantelli to create a number of successive business entities outside of the need to avoid his ongoing tax deficiencies. At the Hearing, the Debtors were unable to offer a viable explanation contradicting this conclusion.

This conclusion, that the Debtors' intentionally created a successive string of business entities for the express purpose of avoiding the tax obligations incurred by Mr. Cantelli's cabinet making business, is further supported by the Debtors' recent action to manipulate their income. Specifically, Mr. Cantelli acknowledged that, out of a concern that his wages would be attached by the IRS, he caused his level of income from the cabinet making business to be decreased, while contemporaneously causing his wife's level of income from the business to be increased.

As applied to § 707(a), these measures, as taken by the Debtors to address their tax liabilities, are contrary to any notion of good faith. *See In re Griffieth*, 209 B.R. 823, 830 (Bankr. N.D.N.Y.1996) (failure to pay tax debt over 10 years weighed toward finding of a "bad faith" filing). This is not to say that the Debtors were completely dilatory in the manner in which they handled their tax obligations to the IRS. Particularly, it did not go unnoticed to the Court that the Debtors, in the

Page 13

years leading up to their bankruptcy filing, did make a couple of substantial payments to the IRS, thereby reducing their tax liabilities.

Yet, the weight of this mitigating factor is diminished when it is considered that the payments made to the IRS for Mr. Cantelli's cabinet making business were specifically directed to and limited to those tax liabilities arising from the failure to pay trust fund taxes – in particular, payroll taxes for employees of Mr. Cantelli's cabinet making business. (Def. Ex. No. 1). Such taxes are nondischargeable in bankruptcy. 11 U.S.C. §§ 507(a)(8)(C), 523(a)(1)(A). Mr. Cantelli is also personally liable for this type of tax liability. 26 U.S.C. §§ 6671 and 6672. As a result, the picture the Debtors attempted to present to the Court – that in paying their delinquent tax obligations, they were acting responsibly and unselfishly – is not entirely accurate, with it being to Mr. Cantelli's legal advantage to pay such taxes ahead of other types of taxes which may be subject to discharge.

Moreover, the Debtors' lack of good faith in their handling their tax liabilities is even more disconcerting given a couple of additional aggravating considerations. First, the Debtors, in 2002, constructed what can only be termed a luxury home. However, prior to, during, and for many consecutive years after the construction of their luxury home, the tax obligations of Mr. Cantelli's cabinet making operation to the IRS were in arrears. The Debtors also, admittedly, used income generated from the cabinet making business to pay for the mortgages encumbering their home. It is, thus, no great leap to conclude that the Debtors partially financed their luxury home through the nonpayment of their tax obligations. The particular character of the taxes involved casts this course of action in a particularly bad light.

As stated, the evidence presented to the Court shows that most of the Debtors' unpaid tax liabilities resulted from the nonpayment of withholding taxes incurred in Mr. Cantelli's cabinet making business. Withholding taxes are those taxes withheld by an employer from an employee's pay to account for an employee's income tax liability. Such funds, thus, do not actually belong to

the employer, with the law placing on a person, such as a Mr. Cantelli, the duty to account for such funds.[5]

It, thus, follows that, for all practicable purposes, the Debtors were using funds which did not belong to them to fund their luxury home. Such a course of conduct is inapposite to any notion of good faith. The Debtors' luxury home further segues into another, and the final consideration lending itself to a finding of bad faith in this case.

In *In re Zick*, the Sixth Circuit Court of Appeals set forth that, as applied to the dismissal of a case under § 707(a), a factor tending to show bad faith concerned "a debtor's failure to make significant lifestyle adjustments." In this matter, when they filed for bankruptcy relief, the Debtors, although having since recanted, set forth that they had intended to retain their home by reaffirming on the property's mortgage obligations. This property, as earlier pointed out, is a luxury home, having 5,176 square feet of living space. To service the mortgage obligations on their residence, the Debtors were required to expend the sum of $7,248.87 per month, an amount which is exclusive of taxes and insurance, not to mention other necessities such as utilities and basic upkeep.

Such an intended use of the bankruptcy process is clearly unfair to the Debtors' creditors, and shows that the Debtors were not serious in their effort to make a significant adjustment to their lifestyle. This conclusion if further reinforced by other aspects of the Debtors' spending habits. First, from 2008 to 2010, the Debtors expended an appreciable amount of money on gambling, and other entertainment related activities. As a part of these expenditures, the Debtors have also taken a

---

[5] "The Internal Revenue Code requires employers to withhold from their employees' paychecks money representing the employees' personal income and Social Security taxes. 26 U.S.C. §§ 3102(a), 3402(a). Because employers must hold these funds in "trust for the United States," § 7501(a), the taxes are commonly called "trust fund" taxes. Should an employer fail to pay such taxes, § 6672 authorizes the Government to collect an equivalent sum directly from the employer's officers or employees who are responsible for collecting the tax and are thus commonly referred to as "responsible" individuals." *United States v. Energy Resources Company, Inc.*, 495 U.S. 545, 545, 110 S.Ct. 2139, 2139-40, 109 L.Ed.2d 580 (1990).

Page 15

number of trips. It was also brought to the Court's attention that, in the time period leading up to their bankruptcy filing, the Debtors employed the services of a housekeeper. As well, the Debtors frequently dine out.

The Debtors contend that they have since ceased and/or decreased such expenditures, thereby showing an intent to make adjustments in their lifestyle. Yet, even assuming this to be true, the Court is not persuaded that a postpetition change in spending habits is automatically indicative of good faith for purposes of § 707(a). This is particularly true under the circumstances presented in this matter where, in the years immediately preceding their bankruptcy, the Debtors' frivolity in their spending continued unstrained, despite the Debtors admittedly knowing the precariousness of their financial situation. Such a consideration was recognized by the Sixth Circuit Court of Appeals as a basis for dismissal under § 707(b), where in addressing whether a debtor was honest – a concept closely akin to good faith as applied to § 707(a) – it was held that a court should consider whether the debtor "was forced into Chapter 7 by unforeseen or catastrophic events." *In re Krohn* 886 F.2d 123, 126 (6th Cir.1989). It also did not go unnoticed to the Court that, at the time they were engaging in unnecessary spending, the Debtors were not filing their personal tax returns and could, as a result, have additional tax liabilities.

In assessing whether a case should be dismissed for a lack of good faith under § 707(a), the Sixth Circuit in *In re Zick* found "particular merit in what is described as the "smell test" . . . ." Under this test, the cumulative weight of the Debtors' actions leads this Court to conclude that, in seeking to receive a Chapter 7 discharge, as opposed to a discharge under a plan of reorganization, the Debtors did not file this case in good faith. As such, dismissal for "cause" under § 707(a) is appropriate. Before concluding, a couple of final points are in order.

First, although much of the evidence and conduct surrounding the Motion to the UST to dismiss was directed at Mr. Cantelli and his business interests, the Court is persuaded that a dismissal of Mrs. Cantelli case is equally appropriate under § 707(a). In the Debtors' financial dealings, Mrs. Cantelli was not an innocent spouse, having been involved in and having benefitted

Page 16

directly from Mr. Cantelli's cabinet making business. Mrs. Cantelli was also responsible for a significant portion of the unnecessary spending as discussed above.

Second, on more than one occasion at the Hearing held on the Motion of the UST to Dismiss, the Debtors testified that some of their actions, which the UST cited as a basis for dismissal, were undertaken on the advice of professionals, such as accountants and attorneys. As an example, Mr. Cantelli testified that, when paying his tax deficiency, he was advised to first pay the trust fund taxes. The implicit message of such testimony was that actions taken on the advice of professionals should not be considered as bearing negatively on a good faith analysis under § 707(a).

The Debtors' attempt, however, to ascribe responsibility to third-party professionals is not persuasive. In this regard, merely because a course of action is legal, does not mean that the action equates with good faith. Consequently, actions taken by a debtor at the advice of a professional will not necessarily insulate such actions from consideration in a good faith analysis. This is particularly true here, where the evidence presented in this matter showed that the Debtors, having been involved in the cabinet making business for more than two decades, are well versed in business practices.

In reaching the conclusions set forth in this Decision, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to herein.

In re Ronald and Leslie Cantelli
Case No. 12-30748

Accordingly, it is

**ORDERED** that the Motion of the United States Trustee to Dismiss pursuant to 11 U.S.C. § 707(a), be, and is hereby, GRANTED.

***IT IS FURTHER ORDERED*** that this case is hereby DISMISSED.

***IT IS FURTHER ORDERED*** that this Court's order of Dismissal is hereby stayed for a period of fourteen (14) days so as to afford the Debtors the opportunity to convert this case.

Dated: January 4, 2013

                                                Richard L. Speer
                                                United States
                                                Bankruptcy Judge

Page 18

# CERTIFICATE OF SERVICE

Copies were mailed this 6th day of January 4, 2013 to:

Leslie L. Cantelli
1837 Cedar Point Road
Sandusky, OH 44870

Ronald Q. Cantelli
1837 Cedar Point Road
Sandusky, OH 44870

Thomas C Pavlik
950 Skylight Ofc Twr
1660 W 2nd Street
Cleveland, OH 44113

John N Graham
5151 Monroe St, #245
Toledo, OH 43623

Derrick Rippy
201 Superior Ave, #441
Cleveland, OH 44114

                                            /s/Diana Hernandez
                                      Deputy Clerk, U.S. Bankruptcy Court